UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ABS HEALTHCARE SERVICES, LLC, a
Florida limited liability company, *et al.*,

CASE NO. 0:20-CV-61456-RS
Magistrate Judge Valle

Plaintiffs,

v.

MAXIM HEALTH INC., a California
corporation,

Defendant.

_____/

## MAXIM'S MOTION TO DISMISS OR TRANSFER,
## OR ALTERNATIVELY STAY PENDING ARBITRATION

Defendant, Maxim Health Inc. ("Maxim"), respectfully moves pursuant to Fed.R.Civ.P. 8 and

12(b) to dismiss the Second Amended Complaint [ECF No. 114] ("Amended Complaint") filed by

Plaintiffs, ABS Healthcare Services, LLC and Health Option One, LLC (collectively, "ICD"), for lack

of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted.

Alternatively, Maxim respectfully requests this Court: (a) transfer the action to the Central District of

California pursuant to 28 U.S.C. § 1406; or (b) stay this action, pursuant to 9 U.S.C. §3, pending the

conclusion of related disputes wherein several courts have now compelled to binding arbitration.

## I.    INTRODUCTION.

In its Amended Complaint ICD failed to correct all the deficiencies raised in Maxim's prior

Motion to Dismiss [ECF No. 71], and most, if not all, of the deficiencies raised in Maxim's original

Motion to Dismiss [ECF No. 15].  Because the Amended Complaint fails to correct the deficiencies

previously raised, the Amended Complaint should be dismissed.

Additionally, this action should be stayed pending the conclusion of several related arbitrations

that have been compelled by other federal and state courts.  In one related matter pending before Judge

Altman in the Southern District of Florida, where ICD alleged concerted conduct involving Maxim

1

and other defendants in that case, ICD *conceded* that the issues raised in that action should be resolved through binding arbitration.  As a result, Judge Altman compelled arbitration.  In light of the arbitration that ICD has now commenced, wherein the claims against Maxim in that action are inextricably intertwined with the claims in this action, this action should be stayed pending the conclusion of that arbitration.

## II.     FACTUAL BACKGROUND.

### A.  Maxim Is An Inactive California Corporation.

Maxim is a California corporation with a principle place of business in Los Angeles, California.[1] Tierney Dec., ¶4. From late 2017 until early 2019, Maxim operated as a health and life insurance agency that primarily marketed low cost health insurance plans to uninsured and underinsured individuals. *Id.* at ¶8.  Since early 2019, when it stopped marketing and selling new products or services, Maxim has been largely inactive. *Id.* at ¶9. Maxim's current source of revenue is solely from reoccurring membership renewals of products and services that Maxim marketed prior to ceasing its marketing and sales efforts in early 2019. *Id.*

### B.  There Is No Nexus Between Maxim's Former Activities And The Claims.

None of Maxim's former business operations establish a nexus between ICD's claims and Florida.  Maxim is not, and has never been, registered to do business in Florida.  *Id.* at ¶5.  Maxim does not own any property in Florida, nor does Maxim Health have any bank accounts in Florida. *Id.*  All of Maxim's employees, independent contractors, and agents were California residents that were interviewed, hired and employed in California. *Id.* at ¶¶6-7.  None of these individuals were residents of Florida, and none traveled to Florida for business while they worked for Maxim. *Id.* at ¶¶11-12.

---

[1] The Declaration of Bradley Tierney, attached as **Exhibit A**, will be referenced as "Tierney Dec., ¶__"; citations to the Second Amended Complaint [ECF No. 114] shall appear as "2d.Am.Comp., ¶__."

Maxim never targeted Florida or any particular state. *Id.* at ¶16. Rather, Maxim sold limited benefit insurance plans to individuals on a nationwide basis. *Id.* Given the manner in which Maxim acquired customers, any contact by Maxim's with Florida was purely fortuitous.[2] The plurality of the individuals who ultimately purchased insurance plans from Maxim were residents of Texas which accounted for more than 20% of Maxim's total sales, while Florida residents only accounted for approximately 10% of Maxim Health's total sales. *Id.*

### C. Maxim Has Not Interfered With ICD's Business Or Otherwise Misappropriated ICD's Alleged Trade Secrets.

Maxim is not aware of the identity of ICD's customers or prospective customers, but to the best of its knowledge, never contacted such customers. *Id.* at ¶15. At the time it was selling insurance, Maxim's policy, once it learned that a prospective customer already had health insurance or a medical plan, was to move on to the next potential customer. *Id.* Moreover, Maxim has never solicited, induced, or otherwise caused any agents of ICD to breach any purported contractual or fiduciary obligations to ICD. *Id.* at ¶¶19-20. None of the individuals Maxim interviewed or hired ever worked as an employee, agent, or contractor for ICD. *Id.* at ¶¶7, 21. Moreover, Maxim never obtained access to, used, or disclosed any of ICD's purported trade secrets. *Id.* at ¶¶22-27.

By contrast, the Amended Complaint is devoid of: (1) the names of any alleged Agents with which Maxim allegedly interfered; (2) the particulars of any contract with which Maxim allegedly interfered; and (3) the names of any customers with which Maxim allegedly interfered.

---

[2] To locate potential customers, Maxim purchased health insurance leads-- general contact information about a consumer who has consented to be contacted and has indicated that he or she is shopping for insurance—from third-party lead-generation vendors. *Id.* at ¶13. Maxim would then either receive calls from potential customers forwarded by the third-party lead-generation vendor, or use the contact information provided by the third-party vendors to contact potential customers and offer the products and services that Maxim offered for sale. *Id.* at ¶14. Maxim pursued the leads regardless of the state in which they were located. *Id.* at ¶16.

**D.  ICD Conceded It Must Arbitrate Claims Involving Maxim.**

Prior to commencing the instant action, ICD sued eight (8) of series of its former Agents and other various individuals and entities, including those who are expressly named in the instant Amended Complaint (e.g., Andrew Shader, Corey Shader, Adam Beeman, National Health Solutions Inc. ("NHS") and Kratos Investments LLC ("Kratos")). *See* 2d.Am.Comp., ¶20.

The "Florida ICD Exclusive Agent Agreements" ("Agent Agreements") referenced in the Amended Complaint contain broad, mandatory arbitration provisions. *Kratos Investments, LLC et al. v. ABS Healthcare Services, LLC, et al.,* 319 So. 3d 97, 100 (Fla. 3d DCA 2021).

Several of the Agents sought and successfully compelled arbitration, and the Florida Fourth District Court of Appeal affirmed two of those orders. *See ABS Healthcare Services, LLC v. Hardill,* 313 So.3d 1162 (Fla. 4th DCA 2021); *ABS Healthcare Services, LLC v. Desola,* 313 So.3d 1163 (Fla. 4th DCA 2021).  Since ICD's allegations against the Shaders, Beeman, NHS and Kratos—all non-signatories to the Agent Agreements—were held to be premised on inextricably intertwined concerted conduct with the Agents, these non-signatories also successfully compelled arbitration. *Kratos Investments,* 319 So. 3d at 101-102; *ABS Healthcare Services, LLC v. Shader,* 2021 WL 2115257 (Fla.Cir.Ct.).

Undeterred by the arbitration provisions of the contracts and the orders compelling arbitration, and unable to avoid arbitration in numerous state court actions, ICD commenced the action styled *ABS Healthcare Services, LLC, et al. v. Andrew Shader, et al.,* Case No. 0:21-CV-60859-RKA (the "Civil RICO Action"), against a number of the individuals and entities who had already successfully compelled arbitration (10 of the 15 defendants named in the Civil RICO Action, including the Shaders, Beeman, NHS and Kratos, had already obtained orders compelling ICD to arbitrate).[3]  A copy of the

---

[3] The table attached as **Exhibit B**, identifying various of the related cases—both in litigation and in arbitration—was filed in the Civil RICO Action.

complaint that ICD filed in the Civil RICO Action on April 21, 2021 is attached as **Exhibit C**.  The complaint in the Civil RICO Action identifies Maxim as one of the entities allegedly involved in a scheme to illegally compete with ICD. *See* **Exhibit C**, ¶¶ 128, 130.

Much like the instant case, in the Civil RICO Action ICD alleged that "Respondents were … instrumental in the organization and funding of a California operation [**Maxim**] set up to illegally compete with ICD." **Exhibit C**, ¶128.  ICD further alleges that "[t]he California operation was fronted by … Brad Tierney and was conducted through a company (**Maxim Health, Inc.**) from late 2017 until the first half of 2019…." *Id.* (emphasis added).  ICD also alleges that Corey Shader set up another company to "funnel money to and from **Maxim**…." *Id.*, ¶130 (emphasis added).

Since the predicate acts that ICD alleged in the Civil RICO Action involved the exact same facts that ICD had already been ordered (by multiple courts) to resolve in arbitration, the defendants (including the Shaders, Beeman, NHS and Kratos) moved, *inter alia* to compel arbitration.  Astoundingly, ICD submitted a response ***conceding that it was appropriate to send the matter to arbitration***.  As a result, the Honorable District Judge Roy K. Altman, in his Order compelling arbitration, noted that "***ICD filed a response in which they consented to arbitration,***" and required ICD to "submit their dispute to binding arbitration…." *See* **Exhibit D** (Judge Altman's Order) (emphasis added).

ICD commenced the arbitration consistent with Judge Altman's Order[4], and it includes the same allegations relating to Maxim as ICD's Complaint in the Civil RICO Action. *See* **Exhibit E** (Demand for Arbitration), ¶¶ 126, 128.  Since ICD has been ordered to arbitrate claims relating to *inter alia* Maxim, and whether Maxim was part of a conspiracy to steal ICD's alleged trade secrets, this

---

[4] ICD filed the arbitration with the American Arbitration Association on Sunday, August 22, 2021, just days before the filing of the Amended Complaint [ECF No. 65] in this action.

Court should stay this proceeding pending the conclusion of ICD's arbitrations. Indeed, if ICD ultimately fails to establish in arbitration that the Shaders, Beeman, NHS and Kratos conspired with or otherwise utilized Maxim for any improper purpose, then such determinations will significantly impact and affect the issues in the instant action.

> **E. Maxim is a party to the California Action, where a TRO has already issued against ICD.**

Maxim's sole principal, Bradley Tierney, is also a principal of Legacy Insurance Solutions, LLC ("Legacy Insurance"). Shortly after receiving a demand letter from ICD in April, 2020, Tierney and Legacy Insurance sued ICD in the action styled *Legacy Insurance Solutions LLC, et al. v. ABS Healthcare Services, LLC, et al.*, California Superior Court Case No. 20SMCV00617 (the "California Action").[5] *See* Tierney Dec., ¶36. Maxim is also one of the plaintiffs in the California Action, as is Adam Bassell (another alleged former ICD Agent). *See* Tierney Dec., Ex. 3. The California Action involves issues similar to those raised in the instant action, namely, whether the Tierney or his companies misappropriated any of ICD's alleged trade secrets, and whether Tierney or his companies wrongfully interfered with ICD's contractual relationships. *Id.*

## III.  ARGUMENT.

> **A. This Court Lacks Personal Jurisdiction Over Maxim.**

ICD's vague and conclusory allegations fail to establish *any* connection between Maxim and Florida, much less a connection that justifies an exercise of personal jurisdiction over Maxim. In the absence of such allegations, this Court lacks jurisdiction over Maxim because Maxim does not "carry on business" in Florida for purposes of the long-arm statute and had not engaged in any business

---

[5] In addition to the California Action, ICD sued Tierney in Florida state court. *See* Tierney Dec., ¶35. As the California court exercised jurisdiction first, the Florida state court stayed its proceedings pending resolution of the California Action. *Id.* at ¶ 37 and Ex. 1. At this juncture, the court in the California Action has now determined that Tierney is likely to prevail on his claims regarding the Agent Agreement, and entered a Temporary Restraining Order against ICD. *See* **Exhibit F**.

*anywhere* for more than 14 months prior to ICD's commencement of this action (now more than 2 years ago). Moreover, although Maxim did not engage in any tortious conduct, to the extent such conduct could have occurred, it necessarily would have occurred only in California where Maxim and its former employees and agents were located.

Courts in the Eleventh Circuit use a two-step inquiry to determine whether exercise of personal jurisdiction over a non-resident defendant, like Maxim, is proper. *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009), *certified question answered,* 39 So. 3d 1201 (Fla. 2010). First, the Court examines whether the exercise of jurisdiction is appropriate under the forum state's long-arm statute. *Id.* Second, the court examines whether the exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.*

A plaintiff seeking to establish personal jurisdiction over a nonresident defendant "bears the burden of making out a *prima facie* case for personal jurisdiction by presenting sufficient evidence to withstand a directed verdict motion." *Id.* (emphasis in original); *see also Murphy v. Republic Health Corp.*, 645 F. Supp. 124, 125 (S.D. Fla. 1986) ("Florida courts require substantial proof before extending *in personam* jurisdiction over non-resident defendants."). Moreover,  it is insufficient for a plaintiff to merely allege facts that show only the *possibility* of jurisdiction. *EcoMed, LLC v. Asahi Kasei Med. Co.*, 2018 WL 4194079, at *3 (S.D. Fla. July 26, 2018), *report and recommendation adopted,* 2018 WL 4193643 (S.D. Fla. Aug. 14, 2018). Vague and conclusory allegations are also insufficient. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006). Once the plaintiff satisfies its initial burden, the burden shifts to the defendant to "raise[], through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction." *Internet Sols.* 557 F.3d at 1295 (11th Cir. 2009) (quoting *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir.1996)). "If the

defendant does so, 'the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents.'" *Id.*

### 1. Jurisdiction does not exist under Florida's long-arm statute.

ICD alleges—without any facts—that the Court has personal jurisdiction over Maxim pursuant to Fla. Stat. §§48.193(1)(a)(1) and 48.193(1)(a)(2).[6&7]   Both these sections are specific personal jurisdiction and therefore the plaintiff's claim ***must arise out of or relate to*** the defendant's contacts with the forum. *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010) (emphasis added). In other words, "the contact must be a 'but-for' cause of the tort." *Id.*

ICD fails to allege sufficient facts to satisfy its initial burden under either provision of the long-arm statute. Moreover, Tierney's declaration rebuts any notion that this Court has personal jurisdiction over Maxim.

### a. Maxim does not carry on business in Florida as required to satisfy Fla. Stat. §48.193(1)(a)(1).

Maxim does not carry on business in Florida for purposes of long-arm jurisdiction.  In order to establish that a defendant is "carrying on business" for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business

---

[6] Section §48.193(1)(a)(1) provides for jurisdiction over a person responsible for "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Section 48.193(1)(a)(2) provides for jurisdiction over a person responsible for "[c]ommitting a tortious act within this state."

[7] ICD also alleges that Maxim "has engaged in continuous and substantial business activity in the State of Florida." 2d.Am.Comp., ¶6. To the extent ICD is alleging that Maxim is subject to general jurisdiction under Fla. Stat. §48.193(2), ICD's single conclusory allegation does not satisfy its significant burden. General jurisdiction largely exists when a defendant's affiliations with a forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317 (11th Cir. 2018), *cert. denied sub nom. Waite v. Union Carbide Corp.*, 139 S. Ct. 1384, 203 L. Ed. 2d 611 (2019) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). General jurisdiction exists only at the defendant's place of incorporation and its principal place of business. *Id.* Maxim is a California corporation with its principal place of business in California. Tierney Dec., ¶ 4. Moreover, Maxim had not engaged in any new business *anywhere* (including Florida) for more 14 months prior to the commencement of this action. *Id.* at ¶ 9.

activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249–50 (11th Cir. 2000). "Relevant factors include: (1) the presence and operation of an office in Florida; (2) the possession and maintenance of a license to do business in Florida; (3) the number of Florida clients served; and (4) the percentage of overall revenue gleaned from Florida clients." *Am. Registry, LLC v. Hanaw*, 2014 WL 12606501, at *8 (M.D. Fla.) (citing *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005)). Here, the allegations and evidence are insufficient to establish that Maxim carries on business in Florida for long-arm jurisdiction purposes and that the cause of action arises out of that business.

ICD's only allegations to support jurisdiction under Fla. Stat. §48.193(1)(a)(1) are that Maxim "operates, conducts, engages in, or carries on business or business venture" and Maxim had "agents travel to the State of Florida for business and engaging electronic and telephonic communications relating to business in the State of Florida." 2d.Am.Comp., ¶¶6-7. Such vague and conclusory allegations are not supported by any facts and do not establish a *prima facie* case of personal jurisdiction absent **specific** supporting factual allegations. *See e.g. PowerTec Sols. Int'l, LLC v. Hardin*, 2019 WL 6170040, at *3 (S.D. Fla. Nov. 20, 2019) (conclusory allegations that the defendants sold products in Florida and that they conduct business in Florida were insufficient); *Vision Int'l Prod. Inc. v. Liteco S.R.L.*, 2007 WL 9700539, at *5 (S.D. Fla. Aug. 8, 2007) (conclusory allegation that defendant sold and continued to sell infringing products in Florida insufficient to establish carrying on a business in Florida); *Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015) (conclusory allegation that defendant had contacts with Florida 24/7 and 365 days a year was insufficient). Likewise, ICD's conclusory allegations are insufficient to connect the purported Florida travel and telephone communications to the claims at issue in this action. *See ProV Int'l Inc. v. Lucca*, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019)("[T]he amended complaint alleges no facts

connecting Lucca's attendance at the trade show with the alleged misappropriation of the plaintiffs' trade secrets.").

Setting aside ICD's failure to present sufficient factual allegations, the evidence before the Court requires ICD to come forward with evidence as opposed to mere allegations. Tierney's declaration establishes that Maxim is not registered to do business in Florida, does not possess or maintain a license to do business in Florida, does not possess any facilities, employees, independent contractors, or agents in Florida, did not send agents into Florida, and does not maintain a Florida bank account. Tierney Dec., ¶¶3-7, 11-12. Likewise, Tierney's declaration establishes that Maxim does not direct its business activities to Florida.[8] *Id.* at ¶¶14, 16. Maxim's employees and agents never traveled to Florida for Maxim's business. *Id.* at ¶12.

### b. Maxim did not commit tortious acts in Florida as required to satisfy Fla. Stat. § 48.193(1)(a)(2).

Maxim did not commit a tort in Florida. While ICD alleges that Maxim "committed tortious acts within this state," *see* 2.Am.Comp., ¶6, ICD fails to allege *any* specific facts to support that allegation. For example, while ICD alleges in conclusory fashion that Maxim interfered with ICD's relationships with its Florida-based agents, customers and prospective customers, ICD does not identify even a single agent, customer or prospective customer. Likewise, ICD does not allege that Maxim took any actions *in Florida* to further its purported tortious interference or trade secret

---

[8] Prior to early 2019, when Maxim was engaged in selling insurance to new customers, it did not target any particular state or states, much less Florida. *Id.* at ¶16. Less than 10% of Maxim's sales were to individuals in Florida, which is simply due to the fact that Florida has a larger population that most states. *Id.* Thus, to the extent Maxim received "leads" for potential clients located in Florida, such receipt was simply fortuitous. *See RG Golf Warehouse, Inc. v. Golf Warehouse, Inc.*, 362 F. Supp. 3d 1226, 1236 (M.D. Fla. 2019) (7% sales in Florida insufficient for purposes of doing business). Regardless, Maxim stopped seeking and writing new business more than 2 years ago. *Id.* at ¶9.

misappropriation.[9]  Accordingly, ICD's allegations are merely conclusory, are insufficient to establish jurisdiction. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (conclusory allegation that defendant conspired and acted through its agents that committed tortious acts in Florida insufficient to establish personal jurisdiction).

Tierney's declaration demonstrates that Maxim did not commit any tort in Florida. While the Amended Complaint provides no guidance as to the relationships, trade secrets, or acts of misappropriation at issue, the undisputed evidence before the Court establishes that Maxim did not solicit, induce, or otherwise cause any ICD agents to breach any purported contractual or fiduciary obligations to ICD. Tierney Dec., ¶¶17-20. Maxim was not even aware of the existence of the purported Agent Agreements. *Id.* at ¶18. Even assuming that Maxim committed any tort, it would have occurred in California where Maxim interviewed and hired its employees and contractors. *See id.* at ¶6. Maxim, to the best of its knowledge, never solicited any of ICD's customers or prospective customers as Maxim does not even know the identity of ICD's alleged customers or prospective customers. *Id.* ¶15.  Further, Maxim never sought to obtain access to, obtained access to, or used any of ICD's purported trade secrets. *Id.* at ¶¶22-27.

### 2.  An exercise of personal jurisdiction will not comport with due process.

Due process requires that Maxim have "minimum contacts with the forum state" and that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004). For intentional torts, courts

---

[9] ICD alleges it generally enters into agreements with its Agents that are governed by Florida law and that they contemplate performance in many states, including Florida. *See* 2.Am.Comp., ¶15. However, ICD fails to allege that the specific agreements at issue in this action require performance *in Florida*. ICD also alleges that Maxim "acted in concert" with various Florida residents and Florida corporations without bringing a conspiracy count or otherwise providing allegations as to how such concerted activity relates to any of the claims, whether the conspiracy itself took place in Florida, and what actions Maxim allegedly took in Florida in furtherance of the conspiracy. *See id.* at ¶ 20.

apply the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783, 804 (1984) to determine whether the defendant has minimum contacts with the forum. *Licciardello v. Lovelady*, 544 F.3d 1280, 1286 (11th Cir. 2008).[10] Under this test, minimum contacts requires that the tort was intentional, aimed at the forum state, and caused harm that the defendant should have anticipated would be suffered in the forum state. *Id.* As explained above, ICD does not allege any torts aimed at Florida. While ICD may have been harmed in Florida, "mere injury to a forum resident is not sufficient connection to the forum" to satisfy the minimum contacts inquiry. *RG Golf*, 362 F. Supp. 3d at 1241 (M.D. Fla. 2019) (citing *Walden v. Fiore*, 571 U.S. 277, 290 (2014)); *Buzz Pop Cocktails Corp. v. Booze Pops, LLC*, 2020 WL 2838825, at \*7 (M.D. Fla. Apr. 22, 2020) (citing cases).

Moreover, an exercise of jurisdiction will not comport with fair play and substantial justice because ICD has not alleged any facts that would implicate Florida's interest in resolving this dispute. Maxim is essentially inactive and would be burdened by litigating in Florida. Accordingly, an exercise of jurisdiction does not comport with due process.

### B.  The Complaint Should Be Dismissed Or Transferred For Improper Venue.

When a defendant challenges venue as improper under Rule 12(b)(3), the court must determine whether the action falls within 28 U.S.C. §1391, and if it does not, the case must be dismissed or transferred pursuant to 28 U.S.C. §1406(a).[11] *Robey v. JPMorgan Chase Bank, N.A.*, 343 F. Supp. 3d 1304, 1313 (S.D. Fla. 2018) (quoting *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 56 (2013)).

---

[10] The Court may also apply the traditional minimum contacts test, which also fails because none of the alleged contacts are related to ICD's cause of action. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1357 (11th Cir. 2013).

[11] 28 U.S.C. §1406(a) provides the court with the discretion to transfer the case in the interests of justice to any district or division in which it could have been brought.  If the Court decides to transfer this action, it should be transferred to the Central District of California, which has the closest nexus to the alleged wrong and where the action could have been brought.

Under Section 28 U.S.C. §1391(b), venue is only appropriate in a judicial district: (1) in which Maxim resides; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or (3) if there is no judicial district in which an action may otherwise be brought, any judicial district in which any defendant is subject to the court's personal jurisdiction.

Here, Maxim is not subject to this Court's personal jurisdiction for the reasons stated above and because Maxim does not reside in Florida. Further, none of the alleged events—much less a substantial part—giving rise to ICD's claims occurred in Florida. Rather, to the extent such actions did occur, they would have occurred in California, where Maxim is located. Accordingly, Maxim respectfully submits that this Court should dismiss this action for improper venue.

### C. The Complaint Should Be Dismissed For Failure To Satisfy Pleading Requirements And Failure To State A Claim.

The Amended Complaint fails to present sufficient allegations to satisfy Rules 8 and 12.  To satisfy these requirements, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Mere labels and conclusions or a formulaic recitation of the elements of a cause of action are not sufficient. *Bell Atl. Corp.*, 550 U.S. at 555. Moreover, a court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

Here, ICD fails to allege anything more than vague and conclusory allegations.  As such, the Amended Complaint fails to include sufficient factual allegations to establish a plausible claim against Maxim.

1. **ICD fails to identify the contracts and business relationships at issue (Counts I and II).**

A claim for tortious interference with a business relationship "requires a business relationship that is evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *ThermoLife Int'l LLC v. Vital Pharm. Inc.*, 2020 WL 409594, at *2–3 (S.D. Fla. Jan. 24, 2020) (quoting *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010)). It is insufficient merely to allege tortious interference with a business's relationship with to the "community at large." *Id.*

Courts in this Circuit have readily dismissed a claim for tortious interference where the plaintiff fails to identify the contractual or business relationship with which the defendant allegedly interfered. *See e.g. Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2019 WL 8063988, at *5 (N.D. Fla. Nov. 14, 2019) (alleging "business relationships with medical facilities throughout the country" insufficient because there was no allegations concerning what the relationships are and how the plaintiffs interfered with the relationships); *Agostinacchio v. Heidelberg Eng'g, Inc.*, 2019 WL 3243408, at *10 (S.D. Fla. Feb. 5, 2019) (alleging interference with "actual and prospective customers" insufficient and requiring plaintiff to at least plead some facts broadly identifying the customers with whom it had a business relationship); *EMP Indus., Inc. v. KECO Inc.*, 2017 WL 10899974, at *2 (M.D. Fla. Nov. 2, 2017) (allegation that plaintiff had "business relationships with customers, potential customers, and vendors" going back 25 years and that defendant interfered with those relationships was insufficient because "the [p]laintiff has not identified at least one such customer relationship.").

ICD merely alleges that Maxim committed acts "designed to induce a breach of the contractual relationship between ICD and its Agents and others by soliciting and causing its Agents to breach their contractual and fiduciary obligations to ICD…." 2d.Am.Comp., ¶27.  At no point does ICD identify which "Agents" or "others" had a contractual relationship with ICD with which Maxim allegedly

interfered.[12] It is not even clear whether such unidentified "Agents" or "others" are in Florida or California.[13]  ICD also does not identify any of its actual or prospective customers or other business relationships with which Maxim purportedly interfered, much less where such customers or business relationships were located.

Accordingly, ICD fails to allege sufficient facts to establish the contracts and relationships with which Maxim purportedly interfered, and therefore, the Amended Complaint should be dismissed.[14]

### 2.   ICD fails to sufficiently allege trade secret misappropriation (Count III).

ICD's trade secret misappropriation claims under the DTSA and FUTSA—both improperly pled as a single count—fail to state a claim because ICD does not allege sufficient factual allegations to put Maxim on notice as to how it allegedly misappropriated ICD's purported trade secrets and what trade secrets are at issue.

---

[12] ICD claims on its website to have over 500 active "Agents" in its organization.  Yet, ICD fails to identify even a single "Agent" by name, no doubt in an effort to avoid the broad, mandatory arbitration provisions in ICD's Agent Agreements. *See, e.g.,* Section III.D. below.

[13] Similarly, ICD's allegations are insufficient to allow the Court to discern whether the reference to "Florida agreements" indicates the agreements were executed entirely within Florida, or that the agreements contain a Florida choice of law provision, etc.

[14] Additionally, since ICD's tortious interference claims are premised upon the use of ICD's alleged trade secrets, the claims preempted or displaced by Florida's Uniform Trade Secrets Act ("FUTSA"). Courts have repeatedly held that FUTSA preempts a tortious interference claim premised on the use of confidential information. *See e.g. Jouria v. CE Res., Inc.*, 2017 WL 3868422, at *4 (S.D. Fla. July 17, 2017) (FUTSA preempted claim for tortious interference with a contract because both claims were premised on the NDA); *Pelfrey v. Mahaffy*, 2018 WL 3110797, at *4 (S.D. Fla. Feb. 7, 2018) (preemption where both the tortious interference and the trade secret claim were based on allegations that the defendant stole the plaintiff's confidential information and used it to compete and divert business); *Measured Wealth Private Client Grp., LLC v. Foster*, 2020 WL 3963716, at *7 (S.D. Fla. July 13, 2020) (tortious interference claim preempted by trade secret misappropriation claim)*.*  Here, ICD's tortious interference claims are based on Maxim's alleged misappropriation of ICD's confidential information.  Indeed, ICD alleges that Maxim caused ICD's agents to breach their agreements "by using ICD's confidential information to market and sell the products that ICD sells to ICD's current and potential customers." 2d.Am.Comp., at ¶28. Moreover, ICD alleges that Maxim interfered with ICD's relationships with its existing and prospective business customers by using the alleged trade secrets to illicitly compete with ICD and poach ICD's actual and prospective  customers. *See id.* at ¶¶19, 20, 49, 51.  Accordingly, Counts I and II are preempted by FUTSA.

In order to sufficiently allege a misappropriation claim, ICD must first "allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret."[15] *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016); *see also Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294 (S.D. Fla. 2018) (relying on *DynCorp* for DTSA and FUTSA claims). Merely identifying "broad categories of information" is insufficient. *See, e.g., Taxinet, Corp. v. Leon*, 2018 WL 3405243, (S.D. Fla. July 12, 2018) (allegation that trade secrets were "confidential business information, processes, techniques, software applications, and business characteristics, including present, future, and proposed services, and business model" was insufficient*); ProV Int'l Inc. v. Lucca*, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) ("The conclusory assertion that the defendants misappropriated 'proprietary practices' and 'operating procedures' neither notifies the defendants about the practices and procedures allegedly misappropriated nor demonstrates that the practices and procedures constitute a trade secret.").

ICD also fails to allege sufficient facts to even remotely suggest "how" Maxim misappropriated ICD's purported trade secrets. *See e.g. Eli Research, LLC v. Must Have Info Inc.*, 2014 WL 4540110, at *7 (M.D. Fla.) (dismissing misappropriation claim where plaintiff failed to plausibly allege misappropriation because plaintiff did not to provide any factual support as to how the defendants misappropriated the alleged trade secrets); *M5 Mgmt. Servs., Inc. v. Yanac*, 428 F. Supp. 3d 1282, 1290 (N.D. Ala. 2019) ("What is important is that the Plaintiff did not adequately allege what its trade secrets were or how the Defendant misappropriated them."); *Knights Armament Co. v. Optical*

---

[15] ICD describes its trade secrets to include a plethora of general categories, such as "proprietary business information," "product specifications," "customer lists," and "market information." *See* 2d.Am.Comp., at ¶47. ICD's descriptions are similar to the insufficient descriptions rejected in *Taxicab* and *ProV*. Moreover, ICD never identifies which of the dozens of general categories of information that make up ICD's trade secrets Maxim allegedly actually misappropriated. Any argument that Maxim misappropriated ***all*** of the alleged categories of trade secret information defies plausibility.

*Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008) (dismissing misappropriation claim where the plaintiff did not allege how the trade secrets were used).  ICD only alleges that some unnamed agents provided Maxim access to some unidentified trade secrets and that Maxim used them to solicit ICD's unnamed customers. *See Id.* at ¶¶51, 56. Such allegations are entirely conclusory in nature.  In light of ICD's failure to identify the purported agents, the customers, the trade secrets, and how any alleged misappropriation is to have occurred, dismissal is appropriate.

> **3. ICD Has Not Presented Sufficient Factual Allegations To Allow This Court To Determine Whether It Should Abstain.**

As noted above, ICD does not identify any specific Agent with whom Maxim allegedly interfered.  Such intentional vagueness may be due to the fact that Maxim never hired anyone who previously worked as an Agent for ICD.  Indeed, as far as Maxim is aware, the only person at Maxim who is even remotely alleged to have been an ICD Agent is Maxim's sole principal/officer/director, Brad Tierney, which would not under any circumstances support a claim for tortious interference. *See, e.g., Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1294 (11th Cir. 2001) ("the interfering defendant must be a third party, a stranger to the business relationship"); *M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni,* 982 F.3d 1333, 1339 (11th Cir. 2020) ("Under Florida law, 'a person with any beneficial or economic interest in, or control over, a contractual relationship is not considered a stranger to the contract and therefore has a privilege to interfere in that relationship.'").  ICD's intentional vagueness and lack of factual allegations identifying any particular Agent(s) with whom Maxim allegedly interfered may be the result of ICD attempting to avoid the mandatory arbitration provision in its Agent Agreements.

In the event that ICD's vagueness and lack of sufficient factual allegations is an attempt to avoid the action that Bradley Tierney commenced against ICD in California, then it would be appropriate for this Court should dismiss or stay this action in favor of the California Action under the

*Colorado River* abstention doctrine.[16]  The California Action represents a more complete action, is further along, includes more parties, and stands to provide more complete relief than the instant action. However, the incomplete and insufficient factual allegations presented in the Amended Complaint make it impossible to assess whether the California Action is parallel to this action.  Accordingly, Maxim respectfully requests that this Court permit additional briefing on the issue of abstention in the event that ICD provides the Court with any information that sheds light on which Agent(s) are relevant to this action.

### D.  This Court Should Stay This Action Pending The Conclusion Of Arbitration.

One federal court—the Civil RICO Action—and three state courts—the Miami-Dade and Broward Circuit Courts, and the Florida Third District Court of Appeal—have determined that ICD's claims involving the "Agents," and even non-signatories like the Shaders, Beeman, NHS, and Kratos **must** be arbitrated.  All of these parties are alleged to have acted in concert with Maxim in the instant case.

The Agent Agreements that ICD references in the Amended Complaint contain mandatory arbitration provisions. *See, e.g., Kratos Investments,* 319 So. 3d at 100; *Shader,* 2021 WL 2115257, *2.  Given the nature of the exclusive arbitration provision in those agreements, ICD has now been ordered repeatedly to pursue claims involving or otherwise predicated upon the Agents in arbitration, even when ICD asserted claims against non-signatories.[17]

---

[16] Under the *Colorado River* doctrine, abstention is warranted if:  (1) a parallel lawsuit is proceeding in state court, and (2) the interests of wise judicial administration demand abstention. *Sini v. Citibank, N.A.*, 990 F. Supp. 2d 1370, 1375–76 (S.D. Fla. 2014) (citing *Colorado River*). A parallel state action is "one involving substantially the same parties and substantially the same issues." *Id.* (quoting *Jackson–Platts v. Gen. Elec. Capital Corp.,* 727 F.3d 1127, 1140 (11th Cir. 2013)).

[17] Indeed, other courts found ICD's claims against even non-signatories to be sufficiently intertwined with ICD's former agents as to permit non-signatories to enforce the broad, mandatory arbitration provision in the Agent Agreements and compel ICD to arbitrate its claims against them. *Kratos Investments*, 319 So.3d at 101-102; *Shader,* 2021 WL 2115257, at *3.

ICD itself acknowledged the propriety of Judge Altman sending the claims in the Civil RICO Action to arbitration when it submitted a response consenting to arbitration. Having consented to the arbitration of claims relating to Maxim and other alleged con-conspirators, ICD is now judicially estopped from taking a contrary position here.

The court order requiring ICD to submit its dispute to arbitration, rendered in the Civil RICO Action, takes on special significance in this action. In the Civil RICO Action, ICD alleges that Maxim was involved in a conspiracy and enterprise predicated on misappropriation of confidential information and trade secrets. *See* **Exhibit E** (Demand for Arbitration), ¶¶126, 128. In response to a motion seeking *inter alia* to compel arbitration in the Civil RICO Action, ICD itself acknowledged that it was proper for Judge Altman to send the claims to arbitration. *See* **Exhibit D**.

As the Eleventh Circuit has noted, "[a]n arbitration decision can have *res judicata* or collateral estoppel effect…." *Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1360 (11th Cir. 1985). Where the "predicate acts alleged in [a] RICO claim are essentially an amalgamation of [the plaintiff's] contractual [and] state law … claims … [and] are the same allegations that were presented to and necessarily decided by the arbitration panel," collateral estoppel applies. *Id.* at 1361. Thus, the arbitrations that ICD has been ordered to conduct will likely resolve the issues raised in the Amended Complaint. If, in fact, Maxim was not part of the conspiracy, and did not interfere with any of the Agents as will be determined in arbitration, then ICD has no basis for pursuing its claims against Maxim or seeking to have this Court exercise personal jurisdiction over Maxim.

If this Court denies Maxim's motion to dismiss, Maxim respectfully requests that this action be stayed pursuant to 9 U.S.C. § 3 pending the conclusion of the arbitration proceedings between ICD and the Agents, and the arbitration proceedings relating to the Civil RICO Action.

The Federal Arbitration Act ("FAA") provides, "without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded."[18] *VVG Real Estate Investments v. Underwriters at Lloyd's, London,* 317 F. Supp.3d 1199, 1203 (S.D. Fla. 2018); *Revelex Corp. v. World Travel Holdings, Inc.*, 2007 WL 1296457, at *5 (S.D. Fla. May 1, 2007) ("suit against a nonsignatory that is based upon the same operative facts and is inherently inseparable from the claims against a signatory should be stayed pending completion of the arbitration"; "[e]ven if the Court were to deny [the] motion to compel arbitration, the Court would certainly stay this litigation").

Here, ICD has been ordered to arbitrate its claims in the Civil RICO Action—indeed ICD itself conceded the propriety of such an outcome to Judge Altman—and ICD has now submitted those claims to arbitration.  Likewise, ICD has been ordered to arbitration against several of the Agents who may or may not be relevant to this action.[19]  Given the impact that these arbitrations are likely to have on the instant action, the Court should stay this proceeding under the FAA to allow these issues to be resolved in arbitration.

## IV.   CONCLUSION.

Based on the foregoing, Maxim respectfully requests this Court dismiss the action, or in the alternative, transfer this action to the Central District of California.  Alternatively, this Court should stay this action pending the outcome of ICD's other pending arbitrations.

---

[18] Similarly, Florida courts recognize that where the outcome of an arbitration may impact an issue in a civil action, that action should be stayed. *Hessen v. Schimmel,* 182 So. 3d 1, 2 (Fla. 3d DCA 2015).

[19] Since ICD did not identify any particular Agent in its pleading, there is no way to know whether the pending arbitrations involving ICD's former Agents will have an impact on this action.  However, given the nature of the allegations in the Civil RICO Action, it seems likely that *all* of the pending arbitrations will have an impact on the outcome of this action.

Respectfully submitted,

    s/ Samuel A. Lewis

By:_____

    James A. Gale / Fla. Bar No. 371726
    E-mail:  jgale@cozen.com
    Samuel A. Lewis / Fla. Bar No. 55360
    E-mail:  slewis@cozen.com
    David M. Stahl / Fla. Bar No. 84713
    E-mail:  dstahl@cozen.com
    Jonathan E. Gale / Fla Bar No. 106938
    E-Mail: jegale@cozen.com
    COZEN O'CONNOR
    Southeast Financial Center
    200 South Biscayne Blvd., Suite 3000
    Miami, Florida 33131
    Telephone:  305-358-5001
    ***Counsel for Maxim***